Next case on our docket is 514-0402, People v. Donald Lee. And for the appellant, Ms. Lassie. Is that correct? Yes. Okay. Whenever you're ready. May it please the court. My name is Jennifer Lassie with the Office of the State Appellant Defender. And I represent the Defendant's Appellant, Mr. Donald Lee. The three interrogation videos in this case... I'm sorry, I can't hear. It's going too fast. A little too fast. The acoustics are terrible. Go ahead. The three interrogation videos in this case were undeniably prejudicial to Mr. Lee. And much of the content within them should never have been played to the jury. In a case such as this, where the evidence was so closely balanced, there was no room for error. First, the trials were aired in denying the motion to suppress statements in the first video, following Mr. Lee's request for counsel. During the first video, Mr. Lee made an unambiguous request for counsel, stating, either you charge me or let me go or give me a lawyer or whatever you've got to do. Why did he continue to talk? So he did finish that statement, and then officers continued questioning Mr. Lee. And he continued talking? Yes, Your Honor, he did continue responding to their interrogation. However, that a defendant continues responding to interrogating officers does not negate his request for counsel. But it does have to be unambiguous to the point where the officers know that he's making that request. Yes, Your Honor. And Mr. Lee did specifically say, give me a lawyer. And while the case law is clear that we do not expect our criminal defendants to have the ability or skills of a Harvard linguist, the case law says that the request must be sufficiently clear so that a reasonable officer would know that he was requesting counsel. And I believe Mr. Lee's statements clearly meet that requirement. This case is synonymous with People v. Howerton cited in the opening brief. In that case, the defendant said, take me upstairs then if I'm under arrest. Either that or I want a lawyer, when he was interrupted and police continued questioning. And the reviewing court found that that was an unambiguous request for counsel. In what case is that? People v. Howerton? It's cited, yes. Yes, it's in the opening brief. Yes. So the state argues that Mr. Lee was expressing to officers his desire to go to the hospital. But I think the statement in itself is very clear that he wanted an attorney. When officers continued questioning Mr. Lee and telling him that he was trying to block out what happened, tell us what happened, Mr. Lee again said, I don't think you understand, either you charge me or let me go. So I do believe the videos are clear that Mr. Lee was invoking his right to counsel. Do you think the videos can be taken? They occurred over a period of a couple days. My question to you is, must we consider the videos independently or can they be taken as a whole? I think they can be considered independently. Should they be considered independently? I mean, your brief seems to argue that. Yes, I do think they are independent. So at the beginning of each interrogation, Mr. Lee did, he was Mirandized in the wake of his right to counsel. I do think each issue stands alone. I think each issue can stand independently. However, perhaps his requests in the third video where he repeatedly asked to be taken back to his cell support that his requests were ignored in the first video. That's kind of what I'm wondering. Can we look at his state of mind in the second and third to support your argument that he knew what he was talking about, he really did want a lawyer. I mean, can we do that or is each one independent? Because they occurred over different days and times and was independently Mirandized. Right. So I do think the legal issues stand by themselves where while you might not find one issue dispositive, I do believe you could independently find the others dispositive. But I do think when you consider the videos together, it demonstrates the pattern by the police of ignoring his requests throughout these interrogations. This was their first murder investigation. That's correct. It was Officer Melvin and Officer Fronthal's very first murder investigation. So while I do think that a reasonable police officer hearing this request for an attorney would have stopped and clarified are you asking for an attorney, which did not happen here. I think perhaps that is because this was their first murder investigation. Do you think the police have a duty to do that? So I think the case law is clear that when an accused makes a request for counsel, the police are to scrupulously honor that request. And I think the case law encourages follow-up with the defendant to ensure that his rights are honored. So in this case, the state conceded that this first issue was preserved and is subject to harmless error. However, it argues that Mr. Lee was not prejudiced by the court's failure to suppress this first interrogation. However, because this video was not suppressed, Mr. Lee, the jury saw Mr. Lee requesting counsel and couldn't have inferred that he was guilty because of that request. The jury also saw him repeatedly threaten police at the end of this video. And they also saw him threaten to assault and batter a potential cellmate if he was put in a cell with another person. And all of this was played for the jury because this first motion to suppress was denied. So I do not believe that the state can establish this was harmless error. Next, trial counsel was ineffective for failing to suppress the first and third videos where Mr. Lee invoked his right to silence. So following up his request for counsel in the first video, 17 minutes later he says, so put me in a cell, leave me the F alone. Again, like his request for counsel, this went ignored by police. In the third video, at 2.26 p.m., he says, can you just put me back in my cell? At 2.38, he says, please just take me back to my cell. A minute later, he says, just quit talking to me. Again, this was a request to end the interrogation and an invocation of his right to silence. A verbal demand to end an interrogation must be specific. And once an accused asserts his right to silence, interrogators must honor this right. And where they continue questioning the accused, as they did here, the statements following the invocation of that right are inadmissible. Mr. Lee used straightforward, even aggressive language with these officers, telling him he wanted to end the interview and telling them to leave him the F alone. And instead, they just continued questioning him. The mistake relies on Mr. Lee's previous comments that they were wasting time. He tells the officers they're wasting time. And State argues that this detracted from his very direct comment that occurred later. What about the fact that he was maintaining his innocence? Doesn't that help you? Well, Your Honor, that brings me to the third issue. All of the video footage where the officers talk about Andrew's family and the derogatory name calling with Mr. Lee, all of that comes up, much of that comes up in the third interrogation. So, again, with the first interrogation, they heard Mr. Lee threatening officers of potential future spellmates. With the third interrogation, if this motion had been filed, it would have kept them from hearing things such as, you're going to make a mother and her brothers put her in the ground without knowing. We're thinking that we're dealing with a cold-blooded killer here. Officers told Mr. Lee she's not going to have any kids, she's not going to have any grandkids. All of this was played for the jury. Much of this coming from the third interrogation video. And if a motion to suppress had been filed, it would have prevented that from going before the jury. At one point, Officer Melvin told Mr. Lee he looked like a damned monster. And before Mr. Lee could even say anything, Officer Funkhauser responds, maybe you are. And all of this was played for the jury. Where a motion to suppress the statements following the invocation of the right to silence would have stopped that, as well as a motion to suppress based simply on these statements. Now, the statements made by officers are admissible to demonstrate their effect on a defendant or to explain the defendant's response. However, even admissible evidence must be excluded from a criminal trial if it is irrelevant and where its prejudicial effect substantially outweighs its probative value. Now, the references to Andrew's family had no probative value because it was entirely irrelevant to the determination of Mr. Lee's guilt or innocence. These statements were unfairly prejudicial, and Illinois courts have consistently condemned the admission of evidence that a deceased left a spouse or family because these statements only serve to prejudice or inflame a jury. And because of this, trial counsel was ineffective for failing to move to suppress these statements. As for the statements regarding the family that Andrew's left behind, the state argues that the jury was aware of the existence of Andrew's family and that the officer's statements were merely humiliating evidence. However, forcing the jury to think about the family losing everything, to think that Andrews would never have children or grandchildren, is much more than being aware that a deceased had a family. Again, the state argues that the officers phrased monster, mobster, and cold-blooded killer comments in such a way as to give Mr. Lee the opportunity to disprove that he was those things. However, a review of the interrogation videos shows that these officers painted a picture of a grieving family deserving of sympathy and a cold-blooded killer and monster responsible for that grief. Is it true that during the third interrogation that 13 requests were made to go back to his cell? Yes, Your Honor. He repeatedly says, take me back to my cell. And I think the opening brief puts time stamps for each one of those. And so do you think that that language is the equivalent of, I don't want to talk to you anymore? Yes, Your Honor. I think it's comparable to the case cited in the opening brief, where a defendant simply covers his ears and says, nah, nah, nah. And I think if that case is an invocation of the right to silence, I think Mr. Lee's statements here go above and beyond. And what's the name of that case? Where he covered your ears. People v. Nielsen. Nielsen, N-I-E-L-S-O-N. It's an Illinois Supreme Court case. Okay. That's okay. They've got it. And in this case, these videos unquestionably should have been suppressed. And there's no denying that they prejudiced Mr. Lee. And errors like this, there was no room for them in this case because of the closeness of the evidence. Though the state says the evidence is overwhelming, if that were the case, the jury would not have taken two days just to decide the first-degree murder charges. With respect to the evidence, Mr. Lee made no attempt to bleed a scene. He told people that first responded that Andrews had shot herself. Though he initially told officers he did not know what happened to Andrews during interrogations, he also told them to do a gunshot residue test on her hands and that they would know what happened. Andrews was shot in the left temple. She had gunshot residue on her left hand, and the only print on the gun was her left thumbprint. Though one witness testified that Andrews was right-handed, video evidence suggests that her left hand was dominant, where she drank, smoked, and played pool all night using her left hand. The state's witness, Dr. Jacoby, who determined that this was a homicide, did so based on four factors. One was that the entry wound was on the left side of Andrews' head, and another was that this occurred in a public gathering. As for the entry wound on the left side of the head, he was never told that Andrews played pool left-handed all night or that she had gunshot residue on her left hand. And he was, as for it being a public gathering, he was told that there were more people there than just Lee and Andrews. The defense expert testified that being aware of these facts would make her more likely to rule the death a suicide. Text messages from Andrews showed that she was lost and could not ever get over Mr. Lee. Through text, she said she loved him more than she had ever loved anyone and that she thought about him nonstop every day and that she had to stop herself from crying over him every day. The video from the Jokers did on the night of her death showed that Andrews was very emotional, that she attacked Mr. Lee's other girlfriend in the parking lot just shortly before her death, and that she sinks down on the ground in front of the bar while Mr. Lee appeared to try to calm her. This was just minutes before her death, and all of her text message statements and all of these emotional outbursts from her on this night support Mr. Lee's claim that this was a suicide. The evidence in this case was very close, and there was no room for these errors. And because of this, Mr. Lee would respectfully request that this court reverse its convictions and release her from the trial with the charges of abortion. Thank you, counsel. You'll have a few minutes after the state takes its position. Good morning. Good morning. Good police report. Jennifer Camden on behalf of the state. So the defendant's argument is that parts of these interrogation videos should have been suppressed He's not arguing that they contain confessions or inculpatory admissions. Instead, they just contain more denials of guilt and claims of inability to remember. And those are completely cumulative of the uncontested portions of the video. Now, I added it up, and the video saw in total about seven hours' worth of those denials and claimed inability to remember. The defendant is arguing that in all, the jury should have seen about five hours' worth of denials and claimed inability to remember. Is that what the defendant is arguing? Is the defendant saying it should have been suppressed? The defendant is arguing that parts of the videos should have been suppressed. Okay. That certainly might. Okay. Well, there is no motion. There was no motion as to the second and third, so we really don't know what would have all been suppressed. We're arguing an effective assistance of counsel as to two and three, interrogation two and three. Regardless of that, let's take your position. What about this claim of you're a monster? And what about this claim about your family and putting her in the ground? And, you know, all that stuff, why should that come in? Okay. Your Honor, the statements about us are using the word monster. In all three videos, the police use an interrogation tactic of asking him to disprove that he's a monster. They ask him whether he was a monster or whether her death was an accident. And they repeatedly tell him, now, I don't think you're a monster. I think that you didn't mean for her to die. They say things like that. Why should that come in? How is that provocative of his guilt? I mean, how is that of any relevance, really? I know you're saying it's a tactic. Yeah. I mean, the question is whether it's – the defendant's position is that it's inadmissible because it is a personal opinion of the officers. But the officers are clearly, in the video, expressing alternative opinions, the opposite opinion. The jury was told that the officers didn't always tell the truth. And the question isn't whether any individual sentence in these seven hours' worth of videos was – whether we can imagine a trial in which any sentence wasn't used. It's whether it was prejudicial. And here, where the – of course, the whole tape was admissible to prove its effect on the defendant, the course of the interrogation, and where the defendant was repeatedly just given that chance to prove or disapprove whether the death was an accident, I don't think that the defendant has proved that the admission of that part of the video was prejudicial. And for the statements about the family, the defendant himself expressed a great deal of concern about Brittany's family. And he's not contesting that that evidence should have been suppressed, only the evidence that the officers also mentioned her family in the context of asking him to give them peace and tell them what happened. So these weren't gratuitous statements about Brittany's family. They were made for the purpose of eliciting the truth from him about what happened.  And it also was – the evidence of the existence of this family was completely cumulative of the testimony at trial, which included Brittany's mother's testimony and Brittany's brother's testimony. So the defendant hasn't proved prejudice from the admission of those statements either. The defendant is arguing that – and argues in the reply reading from page 5 that the fewer lies the jury saw the better off – the defendant tell, the better off he would have been. And what I want to say is that that really comes perilously close to arguing that prejudice can be presumed from the admission of any such evidence, regardless of what else the jury heard. But wrongly admitted cumulative evidence can't affect the outcome of the trial. Again, we're talking about five hours' worth of video versus about seven hours' worth of video. There's a concrete example of this. In this case, in the first video, which was about 90 minutes, the defendant told the police throughout that video that he knew nothing about the shooting. And he continued with that story throughout the first 90 minutes of the second video, that he knew nothing about the shooting. Then he said that she shot herself and then soon after admitted that he had possessed the gun and shot the gun earlier that day. Now, it's my understanding that the defendant is not contesting the admission of that part of the second video. So the defendant's argument with regard to the first video is that the jury wouldn't have acquitted the defendant if it had thought that he only stuck to that initial story, that he literally knew nothing about the shooting, for two hours and 15 minutes instead of for three hours. Can you conjure up a reasonable explanation of why trial counsel would not even file a motion as to number two and three? Because I am concerned about the state's position on this, where they say that, well, the issue may be something to be considered, but this is not the right proceeding. In other words, you could do it in a post-conviction proceeding in effect of assistance to counsel. I'm unsure of what you're referring to. Well, let me just ask straight away. Can you – I can't figure out why the – why counsel didn't raise the motion. Your Honor, I don't – Your Honor, the defendant in this appeal didn't argue that counsel was ineffective for not doing that. I believed until we walked in here that the argument was that the trial court mistakenly denied the motion to suppress the second half of the first video and that there were some arguments about counsel being ineffective for failing to challenge portions of the first and third videos on other grounds. I thought that that was the – Counsel for failing to file a motion to suppress. Yes, Your Honor, but as – That's what it says here. Yes, but the argument is that counsel should have moved to suppress parts of the first and third videos. The part of the first video after 102 and then the parts of the third – the part of the third video after 226. Okay. That is my honest understanding. We can agree on that. That's certainly what I responded to in the appeal. So, I still don't – I know that the counsel met before the videos were played. They jointly agreed to delete certain things from the first video, and then the first video was challenged, but none of the other remaining videos were challenged at all. And that's my question. If you are going to argue that that was trial strategy, how is that trial strategy? What would be in your mind that would make that trial strategy? That he's claim of innocence, for example, I don't know. Your Honor, the question of – that just wasn't briefed, Your Honor, and I don't want to make excuses for something that – for a question about performance when that performance isn't being challenged. Well, there's a statement in your brief that says defendants' claim is better suited to collateral proceedings. What does that mean? Well, I think that the Supreme Court in Beech, in its recent decision in Beech, may have spoken to that suggestion. So, I'll point that out for the Court. And what do you mean by that? I have to see what – Are you talking about post-conviction proceedings? Right. Right, okay. I think we're having a little trouble communicating, but that's okay. I'll look at Beech. But I think that that's what the State is saying in its brief, is that it's looking at post-conviction. And I'm asking myself, why are we not looking at Strickland? Right. Why are we waiting until post-conviction? I don't understand the State's position. Right. Well, I think that any time that a defendant is imputing a strategy to the defense counsel that is not – that's not apparent from the record, and asking the court to presume what the defense counsel was thinking, that is something that is often raised, and I think better raised in post-conviction proceedings. Okay. So you're saying that that wasn't fully briefed in this case, and so the ineffective assistance counsel I'm asking you about would be better for a post-conviction? Because I'm thinking that there's pretty much briefing on this. And maybe I'm wrong. I'm looking for clarification. Yeah. Your Honor, are you asking about the idea of a wholesale request to suppress the second and third videos? Well, not wholesale, but as to certain issues. Yeah. You don't think that was fully briefed here? I'm afraid. I'm looking for your honest answer. No, I'm not. You look here a lot. I'm looking. No, I'm having trouble understanding, honestly, the question, because I'm concerned that we might not even agree about what defendant has raised. And I honestly like to look at it myself. Okay. I need to review the briefs again. It was my impression that ineffective assistance of counsel as to interrogations two and three was an issue before this court. Right. As to a couple of points, it is. But not wholesale. That's certainly not my understanding, Your Honor. Okay. That's the distinction. Okay. Okay. Did you have a couple more things? I took most of your time. Well, Your Honor, if you're offering a couple minutes, I would take it. Do you mind? We'll give her two more minutes. Thank you, Your Honor. I took the time. And we'll give you a little extra, too. Okay. I'd like to point out about the Howerton case that the defendant responded to, in which the defendant was ruled to have invoked his request for counsel by asking police to take him upstairs or get him a lawyer if he was under arrest. Here, the defendant requested a lawyer, among other options, if that was what it would take for police to let him go to the hospital to see Brittany. And while the defendant argues that the context of it should be divorced from any of his previous statements, for this entire 23-minute stretch of the video, he's repeatedly demanding to be taken to the hospital. This wasn't even the first time he gave the police alternatives, if that was what it would take to get him to the hospital. But this was the only time when he mentioned the use of being appointed a lawyer, if that was what it would take to get him to the hospital. And what I want to point out is that there's a difference between the defendant in Howerton giving the police the option of giving him a lawyer if he was under arrest, and the defendant in this case giving the police the option to give him a lawyer if that's what it would take to make police get him to the hospital, because the defendant in Howerton was under arrest, but nothing was going to make the police take the defendant to the hospital to check on Brittany. Also, the facts in Howerton were really blatant. The officer interrupted the defendant's first mention of an attorney by saying, are you that stupid? And then ignored three unambiguous requests for an attorney. I'd also point out that the case law actually says that if a reasonable officer, in light of the circumstances, would only understand that a suspect might be requesting counsel, he's not required to stop the interrogation. And that's from a case cited in the People's Brief. Also, with regards to the left-handed, right-handed thing, I just have to say that Brittany's mother testified that she was right-handed. And when she is drinking in the bar with her left hand, she's holding a cigarette in her right hand. I submit that's not evidence that she was right-handed. Also, the defendant argues that there was evidence that she was very attached to the defendant. Of course, there's some evidence that she was attached to him. The victims of domestic abuse are very attached to their abusers. But I call the court's attention to the transcripts of the text in the answer brief in pages three and four. She was the one refusing to commit to him. She was the one who wasn't giving him what he wanted, which was a commitment and exclusivity with him. She was the one who was afraid that he was going to freak out at evidence that she had another suitor. And she surely didn't try to get away from him that night. I didn't even count the number of times she walked away from him or stalked away from him or physically rebuffed him on that bar video. I think that the evidence is extremely compelling about just what happened that night. And finally, where was the gun? His position was that it was on her person. You can look at that video and see that gun was not on her person. And if the defendant is going to tell a story, he needs to be judged by its inconsistencies. And that is a really big hole in that story. And it's evidence like that, which I don't have time to talk about here, that shows that the evidence was not close in this case. There was a mountain of it. That's why the jury took a while to go through it. There were multiple video feeds that it had to look at. Would you just clarify for me? I know you're out of time, but clarify for me. When you say that the gun was clearly not on her person, what are you referring to? Sorry, Your Honor. At the bar. There is a surveillance video of these two people. In other words, it's not noticeable based on the clothing she's wearing that she's got the gun on her possession at the time. That's correct. I think there's a piece that may show it on him, right? Yes, I did, Your Honor. He raises his shirt up to get some money out of his pocket at one point. And it was the state's position that that was the gun, but it's not so clear. Right. I mean, there's a picture of the gun in evidence. The court can examine what the handle of that looked like and compare it to the picture. To finish answering your question, Your Honor, the video cuts off probably about two minutes before she was killed. They walk out of the frame of the outside video feed. And as of that time, the gun is not showing on her person. Thank you. Thank you. Okay. Do you have a few comments? Yes, Your Honor. First, I just want to clarify the issues. It was a lengthy case, so I think there's some confusion about the issues raised with there being various videos. Mr. Lee did raise in his opening brief arguments that counsel was ineffective for felon to suppress portions of the first, second, and third videotapes on different bases. There definitely was in the opening brief the issue that counsel was ineffective for felon to suppress portions of the second and third videos, particularly where the officers are calling Mr. Lee a cold-blooded killer, monster, and mobster, and all the references to the deceased's family. So just to clarify that. So with respect to videos two and three, the videos speak for themselves when viewed. The officers were not giving Mr. Lee an opportunity to disprove that he was a monster, cold-blooded killer, or monster. The videos show that as their investigation progressed, that was their opinion of him. And these statements are prejudicial in themselves. There's no additional prejudice necessary. That's why we don't allow these statements with the name-calling or the references about the deceased's family to be berated before a jury as though they were here. What about the state's position on people versus speech? So, Your Honor, we don't need post-conviction proceedings in this case. We've got the videos. The videos tell us everything we need to know. And there can be no strategic reason for failing to suppress these statements. There's no understandable reason that trial counsel would want a jury to hear that his client was a monster, mobster, or cold-blooded killer. No reasonable trial counsel would have a reason for the jury to hear about how the deceased would not have children or grandchildren, how her family was suffering, and how her body was being put in the ground. There can be no strategic reason for that, and we don't need post-conviction proceedings to decide that. Next, with regard to the text messages here, I believe there's quite a bit of speculation on the state's part in interpreting these text messages and finding that they show Mr. Lee as being manipulative or that Andrews was trying to let Mr. Lee down easy and that she did not want to be with him. Again, like the videos, the text messages are clear and speak for themselves. She cried over Mr. Lee every day and loved him more than anyone and did not know how she could go on without him. As for the bar, while they were at the bar, if Ms. Andrews wanted to get away from Mr. Lee so badly, it's unclear why when he went to the bathroom at the bar, she texted him four times before he returned. I think she clearly had an attachment to this man, and I think that's evident when his other girlfriend showed up at the bar and Ms. Andrews on videotape commits a battery, hitting this woman. Next, at the bar, the state refers to a still screenshot where Mr. Lee stands up briefly at the bar. There is a dark object in his pocket. What it is, we don't know. It's a dimly lit bar, and it's a dark object in his pocket. I do not believe the video is clear enough for us to say it's a gun. It could be a knife. It could be a cell phone, a wallet. It's something dark in a dimly lit bar. We're not here to argue those facts, though, really. Right. Right, Your Honor. I just don't think... That's for the jury to decide, right? Yes, Your Honor. So, I'm more concerned about your issue of prejudice. The prejudice that you're arguing under Strickland, right? Right. So, with respect to the first video, are you referring specifically to... No, I'm just asking. I mean, I think that is the issue here. Are these videos, they've conceded the other two issues, the unlawful use of weapon and the additional day of pretrial detention. So, what I'm basically saying is if you have more to say about the issue of prejudice, that's what you need to talk to us about as opposed to arguing the facts. I mean, do you think this was a closely balanced case? I do, Your Honor. I think that's demonstrated by the jury's indications that they were equally divided only on the first degree murder charges. They decided the counts three and four the first day. They could not decide on the first degree murder charges, were equally divided, and only could decide on them on the second day deliberations. So, I think the evidence was obviously closely balanced. Mr. Lee never confessed to this crime. His prints were never on the gun. Andrew's print was. He told people that first showed up that she shot herself. So, I do believe the evidence was close. If this would have been a civil case for wrongful death, would the statement by the defendant, my girlfriend shot herself, would that have come in as a spontaneous utterance, do you think? Your Honor, honestly, I don't know. My knowledge of civil law is unfortunately... Well, but I mean, do you think that's a significant fact for your client that she immediately said that? That was the first thing out of his mouth. I do think it's a significant fact. It's the first thing he says to people that run up. In fact, I mean... Did he have time to fabricate the story? You know, Your Honor, that's argued in the opening brief that he wouldn't have time. These people are approaching, they're bar goers, and they hear the shots, and they run across the street immediately and start calling 911. In fact, in one of the audio recordings of 911, you hear Mr. Lee in the background going, help, she's still breathing, she's still breathing, clearly trying to get this woman help. There was no time for him to fabricate a story. She's got, you know, there was no time to put her thumbprint on the gun. So I do believe the evidence was closely balanced. With respect to prejudice, I think the prejudice is clear. In the first video, the jury heard Mr. Lee request counsel, which they might have thought made him look guilty. They heard his threats. With the second and third videos, there were repeated, numerous references to Andrew's family and how much they were suffering. And we've got all the cold-blooded killer monster comments in those second and third videos. And I think the prejudice there is obvious. Those comments are not allowed to come in on direct testimony during the trial because they only invoke sympathy from the jury. And because of... Is there any special instruction given on that? I believe there is. Other than the general instruction, was there a special instruction? Other than, you know, the simple pattern, generic instruction about, you know, your verdict not being based on sympathy, I don't know that any additional instruction was given off the top of my head. Okay. All right. Thank you very much. Okay, we're going to be in short recess. I should rather say this matter will be taken under advisement and in order of mission due course. Thank you. Sorry.